[Nos. 4350-1; 4493-1.    Division One.    January 31, 1977.]

THE STATE OF WASHINGTON, *Respondent*, v. FELIX DAMON, *Respondent*, THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. LEE NICHOLAS WHITE, *Respondent*, THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Appellant*.

*Slade Gorton, Attorney General,* and *William C. Collins, Assistant,* for appellant.

*Christopher T. Bayley, Prosecuting Attorney, Michael C. Duggan, Deputy, Lewis Nomura* and *Gerald Joshua* of *Seattle-King County Public Defender, Barbara Jo Levy, Richard Emery,* and *Adam Kline,* for respondents.

SWANSON, J.—The Department of Social and Health Services (Department) appeals from two decisions of the Superior Court for King County in which the trial judges, after placing the defendants on probation, ordered the Department to pay for the defendants' individualized rehabilitative treatment at private facilities. These cases were consolidated for purposes of this appeal. We hold that in both instances the trial court exceeded its power and reverse for resentencing.

## I. White v. Morris

Lee Nicholas White, a borderline mentally retarded young man, pleaded guilty to one count of attempted grand larceny, RCW 9.54.010, and one count of second-degree burglary, RCW 9.19.020. In the first instance, White and a companion robbed at knife point two young men as they departed from a penny arcade. The second incident involved two break-ins—one at a laundry, the second to a private residence—in which White participated. In each reported incident, the record shows that White was induced to criminal activity or that he was merely "tagging along."

There is no evidence that White in any sense masterminded the acts of which he was later convicted. Rather, there is ample evidence to show that White's condition of mental retardation was a contributory factor to his illegal behavior.

After entering his guilty plea, the trial court imposed a deferred sentence and probation of 3 years upon White with various "conditions" placed on the probation. The trial court found that White, as a mentally retarded offender, enjoyed both a statutory and constitutional right to rehabilitative treatment. In order to meet White's "minimum statutory and constitutional standards" the trial court outlined a treatment program for White composed of six elements:

(a) A structured setting and program.
(b) An individualized treatment plan, and implementation of such plan, to include education and vocational training.
(c) Some distance from a large, crowded urban setting.
(d) Regular counseling or psychotherapy with qualified personnel.
(e) A social milieu and peer group models of acceptable behavior not too far above nor too far below his level of function or intellectual capability.
(f) A program of gradually increasing independence and gradual reintegration into the community in which he will ultimately live.

Finding of fact No. 15, in part. After mandating this type of program, the trial court noted that the facilities then operating under the purview of the state were inadequate to meet White's needs. However, it was brought to the court's attention that certain private institutions, most notably Victoria Village in Stanwood, Washington, stood a reasonable chance of meeting the specific needs of the defendant. Accordingly, as part of his probation, White was ordered to undertake treatment at Victoria Village. Because White was indigent, the trial court, in order to effectuate its probation order, granted a defense motion to join the Department of Social and Health Services as an indispensable party to the action. The effect of such joinder was to render

the state agency liable for the cost of White's private treatment program. The State vigorously challenges both the joinder of the Department to the criminal action and the order mandating the Department to pay for the defendant's private treatment program.

## II. State v. Damon

Felix Damon, an indigent, mentally retarded 18-year-old, pleaded guilty to the crimes of robbery, RCW 9.75.010, and grand larceny, RCW 9.54.010 and .090. Damon, like White, has a history of psychiatric problems including dyslexia which, in part, have contributed to his antisocial behavior. The trial court imposed a 5-year deferred sentence (probation) on Damon under the stipulation that he

(a) . . . be accepted into Adolescent Treatment Program at Fairfax Hospital and remain physically at said hospital until further order of the court. No exceptions (furlough, etc.) will be allowed without prior court approval. . . .

Fairfax Hospital is a privately operated facility similar to Victoria Village. The trial court then ordered that the Department of Social and Health Services be joined as a necessary party to the action and further decreed that the Department pay all expenses "accrued or hereafter to accrue as a result of the defendant being placed at Fairfax Hospital . . ." The Department appeals from the order requiring it to pay the costs of Damon's treatment.

## III. Statutory Grounds

■ The trial courts based their joinder of the Department as an indispensable party on four statutes: RCW 72.08.101;[1] 72.13.010;[2] 72.12.100;[3] and 72.62.010.[4] A careful

[1]RCW 72.08.101 provides:

"The director of institutions shall provide for the establishment of programs and procedures for convicted persons at the state penitentiary, which are designed to be corrective, rehabilitative and reformative of the undesirable behavior problems of such persons, as distinguished from programs and procedures essentially penal in nature."

[2]RCW 72.13.010 provides in relevant part:

"There is hereby established under the supervision and control of the director of the department of institutions a correctional institution for the confinement and rehabilitation of male persons convicted of a

reading of each statute reveals that RCW 72.08.101 and 72.13.010 represent a legislative intent that confinement in a state institution should be rehabilitative in nature, while the remaining two statutes, RCW 72.12.100 and 72.62.010, mandate the establishment of rehabilitative programs for convicted prisoners. The common thread binding all four statutes is their inexorable reference to rehabilitative programs established at state institutions for the treatment of incarcerated prisoners. The statutes, on their face, do not apply to those given deferred sentences and not incarcerated. Nor is their application so broad as to encompass those not confined within a state institution. As a result, we do not find, as did the trial court, a statutory obligation on the part of the Department of Social and Health Services to provide defendants with rehabilitative treatment in private institutions at state expense. What we do find is a general legislative desire that those imprisoned in state institutions be provided with rehabilitative programs designed to alleviate, to some degree, the causes of their antisocial behavior. However, the statutes as they are presently constituted

---

felony and such other persons transferred to such institution as hereinafter provided. . . ."

[3]RCW 72.12.100 provides:

"It shall be the duty of the director to maintain such control over prisoners committed to the reformatory as shall prevent them from committing crime, best secure their self-support, and accomplish their reformation. When any prisoner shall be received into the reformatory under sentence thereto, the director shall cause to be entered in a register the date of such admission, the name, age, nativity and nationality, with such facts as can be ascertained of parentage, or early education and social influences as seem to indicate the constitutional defects and social tendencies of the prisoner and the best probable plan of treatment. In such register shall be entered quarterly, or oftener, minutes of observed improvement or deterioration of character affecting the standing or situation of such prisoner, the circumstances of the final release, and any subsequent facts of the personal history which may be brought to the knowledge of the director or superintendent."

[4]RCW 72.62.010 provides:

"The legislature declares that programs of vocational education are essential to the habilitation and rehabilitation of residents of state correctional institutions and facilities. It is the purpose of this chapter to provide for greater reality and relevance in the vocational education programs within the correctional institutions of the state."

do not mandate rehabilitative treatment to those not placed within the prison's walls.

## IV. Constitutional Grounds

The trial courts, in assessing the rights of mentally retarded offenders, stated that a constitutional right existed in favor of defendants for rehabilitative treatment. This right, the trial courts reasoned, emanated from the due process clause of the Fourteenth Amendment. Assuredly, the right to rehabilitation must be constructed upon quite recent federal court decisions establishing the right of mental patients to a program of treatment while inside the institution. The difficulty, however, with respondents' position in support of the trial courts' actions, is the fundamental differences between the cases they cite and the facts of the present appeal.

Respondents rely on *Rouse v. Cameron*, 373 F.2d 451 (D.C. Cir. 1966), the initial case to discuss the constitutional issue of a mental patient's right to treatment, wherein the District of Columbia Court of Appeals held that a person involuntarily committed to a mental hospital after being acquitted of a criminal offense by reason of insanity had a right to curative treatment. Although the *Rouse* decision is rather clearly based on the presence of a statute, the court did intimate that even in the absence of a statute, failure to provide treatment while confined to an *institution would violate an inmate's constitutional rights.*

Perhaps of even greater significance was the decision in *Wyatt v. Stickney*, 325 F. Supp. 781 (M.D. Ala. 1971), in which the district court, relying on the *Rouse* decision, stated that

> When patients are so committed [involuntary commitment through noncriminal procedures] for treatment purposes they unquestionably have a constitutional right to receive such individual treatment as will give each of them a realistic opportunity to be cured or to improve his or her mental condition.

*Wyatt v. Stickney, supra* at 784. The mandate of adequate and effective treatment was constitutionally required because, absent treatment, the hospital would be transformed

into a penitentiary where one could be held indefinitely for no convicted offense. *See Ragsdale v. Overholser*, 281 F.2d 943 (D.C. Cir. 1960). Thus, as can be seen, the *Wyatt* court expanded upon the *Rouse* dictum to insure the availability of treatment upon a constitutional basis for those persons civilly committed to state mental institutions.[5]

One of the more recent cases expounding on this subject is *Donaldson v. O'Connor*, 493 F.2d 507 (5th Cir. 1974), *vacated and remanded on other grounds*, 422 U.S. 563, 45 L. Ed. 2d 396, 95 S. Ct. 2486 (1975). Mr. Donaldson was civilly committed to a Florida mental hospital for nearly 15 years. The Fifth Circuit, after finding that he had received nothing but custodial care while at the hospital, decreed that a person involuntarily civilly committed to a state mental hospital enjoys a constitutional right to receive individual treatment as will give him a reasonable opportunity to be cured or to improve his mental condition.

While we agree with respondents that the cases cited provide adequate precedent to insure individualized treatment to those civilly committed in this state's mental hospitals,[6] we do not, however, find the present factual circumstances falling within the purview of the holdings of the cited cases. Neither defendant was civilly committed for an indefinite duration to a mental hospital, nor was either found incompetent to stand trial by reason of his mental retardation and placed in a mental institution. Here, we are dealing with persons convicted of crimes who,

---

[5]The *Wyatt* court was undoubtedly moved by the argument before it that persons involuntarily committed through civil procedures oftentimes faced the prospect of years of confinement with its concomitant "massive curtailment of liberty," *Humphrey v. Cady*, 405 U.S. 504, 31 L. Ed. 2d 394, 92 S. Ct. 1048 (1972), with little hope of treatment or cure. However, those confined to state institutions due to some criminal activity on their part are invariably assured of a sentence and commitment of a definite duration with release occurring thereafter. *See Donaldson v. O'Connor*, 493 F.2d 507, 520 (5th Cir. 1974).

[6]Washington's recently enacted mental health act, RCW 71.05, recognizes patient rights to adequate and individualized treatment. In addition, the act applies equally to both voluntarily committed patients and involuntarily committed patients. *See generally Alter v. Morris*, 85 Wn.2d 414, 536 P.2d 630 (1975); 11 Gonzaga L. Rev. 720 (1976).

rather than being sent to a state penal institution, were placed on probation. Accordingly, cases discussing a "committed" person's constitutional rights to treatment are inapplicable to the facts as presently related.[7] In reviewing the right to treatment or rehabilitation in relation to one placed on probation, we are mindful that probation itself is not a matter of constitutional right but is a matter of privilege and grace authorized by the legislature and implemented through judicial discretion. *Mempa v. Rhay*, 68 Wn.2d 882, 416 P.2d 104 (1966), *rev'd on other grounds*, 389 U.S. 128, 19 L. Ed. 2d 336, 88 S. Ct. 254 (1967); *State v. Farmer*, 39 Wn.2d 675, 237 P.2d 734 (1951). As such, few if any constitutional guaranties attach to the status of probation. In fact, our courts have repeatedly stated that the decision to grant or deny probation is one resting within the sound discretion of the trial court. *State ex. rel. Woodhouse v. Dore*, 69 Wn.2d 64, 416 P.2d 670 (1966); *State v. Withers*, 8 Wn. App. 123, 504 P.2d 1151 (1972).

■ In summary, we find that the defendants did not enjoy a statutory nor a constitutional right to rehabilitative treatment at state expense as a condition of their probation. Because the determinative question posed by these appeals is one of policy, and a policy open to considerable doubt, it is a question for the legislative branch of government and not for the courts. Fundamental concepts of separation of powers as expressed in *In re Juvenile Director*, 87 Wn.2d 232, 552 P.2d 163 (1976), make it clear that social issues must be addressed to the legislature. Moreover, because

---

[7]Inasmuch as the defendants were placed on probation and not confined to a penal institution, we deem it inappropriate to enter into a general discussion of the rights accorded prisoners situated in Washington's institutions. Quite recently, however, our Supreme Court in *Bresolin v. Morris*, 88 Wn.2d 167, 558 P.2d 1350 (1977), stated that rehabilitation of convicted persons, albeit a legitimate governmental interest and institutional goal, is not an enforceable right. Quoting from a United States Supreme Court decision, Justice Rosellini, in his opinion for the majority states that " 'there is no "fundamental right" to rehabilitation . . . at public expense after conviction of a crime' ", *Bresolin v. Morris, supra* at 171, *quoting Marshall v. United States*, 414 U.S. 417, 421, 38 L. Ed. 2d 618, 94 S. Ct. 700 (1974).

probation is a status authorized by legislative act, the legislature alone is responsible for providing treatment at the state's expense to those placed on probation by the trial court.

We find that the trial courts exceeded their authority when they ordered the Department of Social and Health Services to reimburse private institutions for the care and treatment of defendants.

Reversed for resentencing.

WILLIAMS and ANDERSEN, JJ., concur.